AO 106 (Rev. 04/10) Application for a Search Warrant *(Page 1)*

## UNITED STATES DISTRICT COURT
### for the
### Northern District of New York

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| | ) |
| | ) Case No.    8:25-SW-156 (GLF) |
| **IN THE MATTER OF THE SEARCH OF (1) GRAY SAMSUNG CELLPHONE (2) A WHITE APPLE IPHONE (3) A BLACK SAMSUNG CELLPHONE (4) A WHITE SAMSUNG CELLPHONE (5) A BLACK SAMSUNG CELLPHONE, CURRENTLY LOCATED AT 1969 RIDGE ROAD, PLATTSBURGH, NEW YORK 12919.** | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property: *(identify the person or describe the property to be searched and its given location)*:

Please see Attachment A (incorporated by reference)

located in the    Northern    District of    New York    , there is now concealed
*(identify the person or describe the property to be seized):*

Please see Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒    evidence of a crime;

☐    contraband, fruits of crime, or other items illegally possessed;

☒    property designed for use, intended for use, or used in committing a crime;

☐    a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. § 1324(a)(1)(A)(ii) and 8 U.S.C. §1325(a)(2) | Transport and move or attempt to transport and move three aliens knowing and in reckless disregard of the fact that the aliens had come to, entered, and remained in the United States in violation of the law by means of transportation or otherwise, in furtherance of the aliens' violation of law. |
| | The defendants, are aliens and citizens of Mexico or Guatemala, unlawfully eluded examination and inspection by Immigration officials by entering the United States at a place not authorized for the entrance of immigrants. |

AO 106 (Rev. 04/10) Application for a Search Warrant *(Page 2)*

The application is based on these facts:

See attached Affidavit.

☒    Continued on the attached sheet.

☒    Delayed notice of ___30___ days (give exact ending date if more than 30 days):
is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Alex J. Espinoza, BPA

*Printed name and title*

Attested to by the Affiant:

Date:    July 8, 2025

City and State:    Plattsburgh, NY    Hon. Gary L. Favro, U.S. Magistrate Judge

I, the Honorable Gary L. Favro, United States Magistrate Judge, hereby acknowledge that this affidavit was attested by the affiant by telephone on July 8, 2025 in accordance with Rule 4.1 of the Federal Rules of Criminal Procedure.

Hon. Gary L. Favro
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF (1) GRAY SAMSUNG CELLPHONE (2) A WHITE APPLE IPHONE (3) A BLACK SAMSUNG CELLPHONE (4) A WHITE SAMSUNG CELLPHONE (5) A BLACK SAMSUNG CELLPHONE, CURRENTLY LOCATED AT 1969 RIDGE ROAD, PLATTSBURGH, NEW YORK 12919.** | Case No.  8:25-SW-156 (GLF) |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Alex J. Espinoza, being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of 5 cellular telephones described in Attachment A, and the extraction from that property of electronically stored information described in Attachment B.

1.      I am a Border Patrol Agent (BPA) with the United States Border Patrol (USBP). I have been a Border Patrol Agent with USBP since 2018. In addition to my position as a BPA, I am on the Prosecution Detail at the Champlain Border Patrol Station. I have been on the Prosecution Detail since February 2024. I have participated in numerous human smuggling investigations in which I have reviewed and analyzed recorded conversations and records of human smugglers. Through my training and experience, I have become familiar with the way people are smuggled into and distributed throughout the United States, and the efforts of persons involved in such activities to avoid detection by law enforcement. I have participated in investigations and prosecutions of complex human smuggling organizations. I have also conducted

analyses of telephone billing records for telephones used by human smugglers. I have had and continue to have conversations with intelligence agents from the Swanton Sector Intelligence Unit concerning this investigation and other human smuggling related investigations.

2.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3.     Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 8, United States Code, Section 1324. (Transport and move or attempt to transport and move three aliens knowing and in reckless disregard of the fact that the alien had come to, entered, and remained in the United States in violation of the law by means of transportation or otherwise, in furtherance of the alien's violation of law) Title 8, United States Code, Section 1325 (The defendants, aliens and citizens of Mexico and Guatemala unlawfully eluded examination and inspection by Immigration officials by entering the United States at a place not authorized for the entrance of immigrants) (collectively, the "SUBJECT OFFENSES") have been committed by MACARIO-Suy, Jose Lorenzo, MARTINEZ-Perez, Nely Noemi, DOMINGUEZ-Tapia, Sergio and AJIN-Popol, Rudy Alexander. Further, there is probable cause to believe that the Devices described in Attachment A will contain evidence of the SUBJECT OFFENSES, as described in Attachment B. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.    The property to be searched is: (1) gray Samsung cellphone (2) a white Apple iPhone (3) a black Samsung cellphone (4) a white Samsung cellphone (5) a black Samsung cellphone; collectively referred to as "the Devices." The Devices are currently located at the Champlain Border Patrol Station, 1969 Ridge Road, Champlain, New York 12919.

5.    The applied for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

**PROBABLE CAUSE**

6.    On June 14th, 2025, at approximately 9:28 p.m., Swanton Sector Communications (KAD 640) notified Champlain Border Patrol Agents they had received remote images of multiple people walking through the woods near Roxham Road, in Mooers, New York. This heavily wooded remote area is approximately half a mile from the United States/ Canada International Boundary. Due to its close proximity to the international boundary and the remoteness of the area it is frequently exploited by people attempting to enter the United States illegally. Border Patrol Agents responded but were unable to locate the individuals.

7.    On June 15th, 2025, at approximately 9:05 a.m., a concerned citizen contacted KAD 640 regarding a vehicle with Pennsylvania plates driving back and forth on North Star Road, near Thompson Road, in Mooers, New York. KAD 640 relayed this information to the Champlain Border Patrol Station and agents responded. At approximately 9:07 a.m. an agent was headed West on New York State Route 11 when he noticed a black sedan without a front license plate heading East in Champlain, New York. The agent performed a U-Turn and noticed the black sedan had a Pennsylvania license plate matching the description sent from KAD 640. The vehicle began to head South on Interstate 87 from Exit 42. The agent followed the sedan South on Interstate 87 and activated his emergency lights and performed a vehicle stop.

3

8.    The Agent approached the vehicle, identified himself as a United States Border Patrol Agent and questioned the driver (later identified as MACARIO-Suy, Jose Lorenzo) as to his citizenship and reason for being in the area. MACARIO-Suy stated that he was Guatemalan and that he was legally present in the United States. The front seat passenger MARTINEZ-Perez, Nely Noemi stated she was Mexican and she was legally present in the United States. The two rear passengers DOMINGUEZ-Tapia, Sergio and AJIN-Popol, Rudy Alexander, declined to answer. The agent noticed MACARIO-Suy's clothes were clean but the passengers' clothes and backpacks were wet and dirty consistent with walking through the woods.

9.    The agent removed MACARIO-Suy from the vehicle and requestioned the passengers if they had entered the United States illegally, and all three replied, yes. MACARIO-Suy and the three passengers were placed under arrest and transported to the Champlain Border Patrol Station for further investigation.

10.    At the station, MACARIO-Suy's biographical information and fingerprints were entered into Department of Homeland Security databases. It was revealed that MACARIO-Suy, is citizen of Guatemala and did not have any criminal history within the United States. MACARIO-Suy had previously petitioned for an immigration status in the United States but his case was dismissed on September 12, 2024. Record checks further revealed that neither MACARIO-Suy, MARTINEZ-Perez, DOMINGUEZ-Tapia, or AJIN-Popol had any immigration documentation to be within the United States legally.

11.    At the time of the stop, MACARIO-Suy was found in possession of one gray Samsung cellphone and did not give consent to search the phone. MARTINEZ-Perez was found in possession of one white Apple iPhone at the time of the arrest and did not give consent to search the phone. AJIN-Popol was found in possession of a black Samsung cellphone and did not

4

give consent to search the phone. DOMINGUEZ-Tapia was found in possession of a white Samsung cellphone and a black Samsung cellphone and did not give consent to search the phones.

12.    In your affiant's training and experience, it is common for individuals engaged in human smuggling, as well as monies derived from these activities, to use cellular phones to further these criminal activities. Cellular phones, such as the Devices seized from MACARIO-Suy, MARTINEZ-Perez, DOMINGUEZ-Tapia, and AJIN-Popol can be used to send and receive text messages, and to allow voice communication. Smartphones, such as the Devices can also be used to access social media. Through my training and experience, I am aware that individuals engaged in human smuggling, such as MACARIO-Suy, MARTINEZ-Perez, DOMINGUEZ-Tapia, and AJIN-Popol, commonly store names, phone numbers, and contact information for co-conspirators on cellular phones. I am also aware that individuals engaged in human smuggling such as MACARIO-Suy, MARTINEZ-Perez, DOMINGUEZ-Tapia, and AJIN-Popol commonly plan and discuss their human smuggling activities and the proceeds of these activities by text message or on smartphone messaging applications.

13.    Based on the above-listed law enforcement investigation, there is probable cause to believe that the Devices may contain evidence of human smuggling.

14.    The Devices are currently in storage at 1969 Ridge Road, Champlain, New York 12919. In my training and experience, I know that these Devices have been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the USBP.

## TECHNICAL TERMS

15.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

6

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a
handheld digital storage device designed primarily to store and play audio, video, or
photographic files.  However, a portable media player can also store other digital
data.  Some portable media players can use removable storage media.  Removable
storage media include various types of flash memory cards or miniature hard drives.
This removable storage media can also store any digital data.  Depending on the
model, a portable media player may have the ability to store very large amounts of
electronic data and may offer additional features, such as a calendar, contact list,
clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its
current location.  It often contains records of the locations where it has been.  Some
GPS navigation devices can give a user driving or walking directions to another
location.  These devices can contain records of the addresses or locations involved in
such navigation.  The Global Positioning System (generally abbreviated "GPS")
consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an
extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical
representation of the current time, combined with a special sequence of numbers.
These signals are sent by radio, using specifications that are publicly available.  A
GPS antenna on Earth can receive those signals.  When a GPS antenna receives
signals from at least four satellites, a computer connected to that antenna can
mathematically calculate the antenna's latitude, longitude, and sometimes altitude
with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for
storing data (such as names, addresses, appointments or notes) and utilizing computer
programs. Some PDAs also function as wireless communication devices and are used
to access the Internet and send and receive e-mail. PDAs usually include a memory
card or other removable storage media for storing data and a keyboard and/or touch
screen for entering data. Removable storage media include various types of flash
memory cards or miniature hard drives. This removable storage media can store any
digital data. Most PDAs run computer software, giving them many of the same
capabilities as personal computers. For example, PDA users can work with word-
processing documents, spreadsheets, and presentations. PDAs may also include
global positioning system ("GPS") technology for determining the location of the
device.

16.     Based on my training, experience, and research, I know that cellular devices, like
the Devices have capabilities that allow them to serve as a wireless telephone and digital camera.
In my training and experience, examining data stored on devices of this type can uncover, among
other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

17.     Based on my knowledge, training, and experience, I know that electronic devices
can store information for long periods. Similarly, things that have been viewed via the Internet
are typically stored for some time on the devices. This information can sometimes be recovered
with forensics tools.

18.     *Forensic evidence.*     As described in Attachment B, this application seeks
permission to locate not only electronically stored information that might serve as direct evidence

8

of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

    a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.   Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.   The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

9

    e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

19.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Devices to human inspection in order to determine whether it is evidence described by the warrant.

20.    *Manner of execution.*  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## BIOMETRIC ACCESS TO DEVICES

21.    Based on my training and experience, it is likely that some of the Electronic Media authorized to be seized and searched will contain features that allow the devices to be unlocked with facial recognition, eye recognition, and/or fingerprint identification technology.

22.    The requested warrant would also permit law enforcement to compel MACARIO-Suy, MARTINEZ-Perez, DOMINGUEZ-Tapia, and AJIN-Popol to unlock any such device.  The grounds for this request are as follows:

    a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users

the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize. The proposed warrant would permit law enforcement to compel MACARIO-Suy, MARTINEZ-Perez, DOMINGUEZ-Tapia, and AJIN-Popol to unlock any electronic device requiring biometric access, if that device is found during the search.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing

11

camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d.  If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such

12

features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

23.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via biometrics, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.

24.     The requested warrant would permit law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of MACARIO-Suy, MARTINEZ-Perez, DOMINGUEZ-Tapia, and AJIN-Popol to the fingerprint scanner of the Devices subject to seizure and search; and (2) hold the Devices in front of the face of MACARIO-Suy, MARTINEZ-Perez, DOMINGUEZ-Tapia, and AJIN-Popol to activate the facial recognition feature, for the purpose

13

of attempting to unlock the Devices to search the contents as authorized by this warrant.

25.     The proposed warrant does not authorize law enforcement to require that MACARIO-Suy, MARTINEZ-Perez, DOMINGUEZ-Tapia, and AJIN-Popol verbally say or otherwise provide the password or any other means that may be used to unlock or access any device. Moreover, the proposed warrant does not authorize law enforcement to require MACARIO-Suy, MARTINEZ-Perez, DOMINGUEZ-Tapia, and AJIN-Popol to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

## CONCLUSION

26.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

## REQUEST FOR SEALING

27.     I respectfully request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary, because the warrant is relevant to an ongoing investigation into a criminal organization and not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that, criminals actively search for criminal affidavits and search warrants via the internet and disseminate them to other criminals as they deem appropriate, *i.e.*, post them publicly online through carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

14

Attested to by the Affiant:

Alex J. Espinoza
Border Patrol Agent
United States Border Patrol

I, the Honorable Gary Favro, United States Magistrate Judge, hereby acknowledge that this
affidavit was attested by the affiant by telephone on July 8, 2025 in accordance with Rule 4.1
of the Federal Rules of Criminal Procedure.

Hon. Gary L. Favro
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

1. The property to be searched is: (1) gray Samsung cellphone (2) a white Apple iPhone (3) a black Samsung cellphone (4) a white Samsung cellphone (5) a black Samsung cellphone, collectively referred to as "the Devices." The Devices are currently located at the Champlain Border Patrol Station, 1969 Ridge Road, Champlain, New York 12919.

2. This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B. Some of the above-described property is data that will be contained on electronic and machine-readable media which is not readable in its present state. Your applicant requests that the court give authorization for searching law enforcement officers to seize, listen to, read, and maintain the above-described property, and to convert it to human-readable form as necessary. I further request that such warrant authorize the Devices to be subject to any forensic examination by the authorized law enforcement officers, or any other entity who may possess the technology to complete the examination.

## ATTACHMENT B

1.      All records on the Devices described in Attachment A that relate to violations of 8

U.S.C. § 1324(a)(1)(A)(ii) (Transport and move or attempt to transport and move three aliens

knowing and in reckless disregard of the fact that the alien had come to, entered, and remained in

the United States in violation of the law by means of transportation or otherwise, in furtherance

of the alien's violation of law), and 8 U.S.C. §1325(a)(2) (The defendants, aliens and citizens of

Mexico and Guatemala, unlawfully eluded examination and inspection by Immigration officials

by entering the United States at a place not authorized for entrance of immigrants), and involve

MACARIO-Suy, MARTINEZ-Perez, DOMINGUEZ-Tapia, AJIN-Popol and other co-

conspirators, including:

      a.  The smuggling and transportation of illegal aliens;

      b.  Statements pertaining to a conspiracy to distribute illegal aliens;

      c.  GPS and location data;

      d.  Lists of customers and related identifying information;

      e.  Types, and prices for human smuggling, as well as dates, places, and amounts of specific transactions;

      f.  Any information related to sources of illegal aliens (including names, addresses, phone numbers, or any other identifying information);

      g.  All bank records, checks, credit card bills, account information, and other financial records.

      h.  Any information pertaining to the monies derived from illegal activities, human smuggling and the laundering of monies associated with criminal activity.

  i. Evidence of the relationship between MACARIO-Suy, MARTINEZ-Perez,

    DOMINGUEZ-Tapia, AJIN-Popol and any other coconspirators;

  j. Evidence pertaining to human smuggling in Plattsburgh, New York and the

    surrounding areas;

  2. Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

  As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

2